Baldwin, J.
delivered the opinion of the Court.
The constitution of the United States gives to Congress exclusive legislation over such district, not exceeding ten miles square, as may, by cession of particular States, and the acceptance of Congress, become the seat of government of the United States. This provision recognizes the authority of States to make the cession, and of Congress to receive it; and carries with it the incidental powers of reciprocal legislation, adapted to the accomplishment of the purpose. And it thus became the duty of ceding States on the one hand, and of Congress on the other, so to provide, in the transfer of sovereignty and jurisdiction, that the rights of individuals and the incidental remedies, existing at the time, should receive no detriment.
Accordingly, we find that by the act of cession of the Virginia Legislature of December 1789, it was provided, that the jurisdiction of the laws of the State, over the persons and property of individuals residing within the limits of the cession, should not cease or determine, until Congress, having accepted the cession, should, by law, provide for the government thereof. *70 under their jurisdiction. The act of cession of the Maryland Legislature contains the like provision in identical words. And the acts of acceptance of Congress, of July 1790, and March 1791, embrace a provision, that the operation of the laws of the ceding States, within such district, should not be affected by the acceptance until the time fixed for the removal of the seat of government. And the act of Congress of February 1801, for the government of the district, makes provision for obtaining executions on judgments and decrees which had been, or should be, obtained in the Courts of Maryland or Virginia, by filing exemplifications of the proceedings in the Court of the district.
In the case of Van Ness, &c. v. The Bank of the United States, 13 Peters’ R. 17, a question arose as to the validity of a title to certain lots in the City of Washington, derived from a decree of the Chancery court of Maryland, rendered in October 1801, after Congress had assumed jurisdiction over the territory, though in a cause pending before. And it was held by the Supreme court of the United States, that it was not the intention of the parties to the cession, that suits pending at the time, should abate; and that without stopping to enquire what, upon general principles of law, would be the effect of a cession upon suits then pending in the ceding sovereignty, it was evident that the State and the United States both intended that the suits then pending in the Maryland tribunals, should be proceeded in, until the rights of the parties should be finally decided, and that the judgments and decrees there made,' should be as valid and conclusive as if the sovereignty had not been transferred.
It is admitted on all hands, that Congress had the constitutional power of retroceding, and Virginia of accepting the retrocession of territory, ceded by the latter to the former as above mentioned; and it follows that *71 these parties had the like incidental powers of legislation, to give effect to the retrocession, as they possessed in regard to the original cession, and incurred the like obligations of duty in regard to the rights and remedies of individuals existing at the time of the retrocession.
The retrocession was accomplished by a series of legislative acts, beginning with the act of the Virginia Legislature of February 1846, which provided that, so soon as the Congress of the United States should recede to the Commonwealth of Virginia, the county of Alexandria, and relinquish their exclusive jurisdiction, as well of territory as of persons residing, or to reside therein, the same should be re-annexed to this Commonwealth, and constitute a portion thereof: and which declared that the jurisdiction and laws of the United States, as well as the rights and privileges of the citizens of said county, and bodies politic and corporate thereof, should continue in force and be exercised, in like manner, and to the same extent, as they then existed, until the General Assembly of Virginia should, by law, provide for the government of said county, under the constitution and laws of this Commonwealth.
The next step was taken by the Congress of the United States, by the act of July 1846; by which, when the assent of the people of the county and town of Alexandria should be ascertained as therein prescribed, all that portion of the District of Columbia ceded to the United States by the State of Virginia, and all the rights and jurisdiction therewith ceded over the same, were retroceded and forever relinquished to the State of Virginia, in full and absolute jurisdiction, as well of soil as of persons residing or to reside therein. But that the jurisdiction and laws then existing in the said territory, over the persons and property of individuals therein residing, should not cease or determine, until the State of Virginia should thereafter provide by law for the extension of her jurisdiction and judicial system over the territory so retroceded.
*72 This was followed by the act of the General Assembly of Virginia of March 1847, by which the laws 'and jurisdiction of this Commonwealth were extended over the retroceded territory, with certain exceptions for the preservation and protection of the rights and remedies of individuals. It was never contemplated by the high contracting parties to continue in existence for these purposes the Circuit and inferior courts of the District for Alexandria county; and therefore provision was made for the transfer to the appropriate Courts established by the act, of all original and record muniments of title, and of all judgments, decrees and orders in actions and suits which had been determined, and of all actions and suits depending. In regard to actions and suits on the docket of the Circuit court of the District for Alexandria county, which had been carried by appeal into the Supreme court of the United States,(which Congress had constituted the appellate Court of the District,) these were not in a condition to be transferred to the Superior court of law and chancery established by the act, without a transfer also of the pending appeals therein to an appellate forum in Yirginia. The latter would have been inconvenient and inexpedient, for obvious reasons; and there was no necessity for the measure, inasmuch as the tribunal in which the appeals were pending continued in existence, with complete jurisdiction over them ; unless, indeed, it should be deprived thereof by legislation or the want of legislation on the subject. The act, therefore, recognized the continued jurisdiction of the Supreme court in regard to the pending appeals; and inasmuch as its adjudications could not be transmitted to the Circuit court of the District for the county of Alexandria, by reason of the abrogation of the latter Court, provision was made for the transmission of them to, and the carrying of them into effect by, the Circuit Superior court of Yirginia established by the act. The prescribed form of *73 such transmission, by mandate from the Supreme court, was a mere matter of form, inasmuch as the subsequent proceedings were to be had in, and by force of the jurisdiction of, the new tribunal, and subject to the jurisdiction of the Supreme court of appeals of Virginia.
In conformity with this last act of the Legislature of Virginia, the supplemental act of Congress of July 1848, was passed, by which provision was made for the continued jurisdiction of the Supreme court of the United States, in causes pending therein from the Circuit court of the District for the county of Alexandria, at the time when the jurisdiction and laws of Virginia had been extended over the same; and for the transmission of its adjudications, in such appellate causes, to the proper tribunal in Virginia invested by her laws with jurisdiction to carry the same into effect.
We need not enter into any criticisms upon the phraseology of these several acts of Congress and of the General Assembly. They must be treated, one and all, as parts of one entire legislative compact between the high contracting parties, upon the subject with which they dealt, and over which they had unquestioned constitutional power. That subject was, the retrocession of sovereignty and jurisdiction, and the provisions by which it was to be accomplished were matters of sound discretion and enlightened expediency. The very sovereignty and jurisdiction of which they treated, enabled the parties to reserve, temporarily, a portion thereof, for the more perfect and beneficial transfer of the whole. It was essential to provide for the disposal of the existing litigation in the Courts of the retroceded territory, and that could be done, in relation to actions and suits pending in the appellate Court, only by allowing them to be adjudicated in that forum, or by transferring them for adjudication to some other tribunal. The wild and mischievous result, if that could have followed from naked *74 retrocession, of suffering the pending appeals to fall from the jurisdiction of the Supreme court, without care as to their future fate, or that of the judgments an(i decrees from which they sprang, was surely, at no Pei'i°d of the legislative treaty, for a moment contemplated. The wise and beneficent expedient has been adopted of retaining the jurisdiction of the Supreme court over such appeals; and we have no difficulty upon the question, whether this was done in due time and by competent authority.
As to the time. The compact was not to be evidenced by a deed to be signed and sealed by the high contracting parties or their agents; but by reciprocal acts of "legislation, to be passed from time to time as the occasion should require, and resulting in their mutual consent to the several provisions, as expressed by both of the parties, or by either with the acquiescence of- the other. The proper time for Virginia to introduce her stipulation for adjudication by the Supreme court, of the appeals depending at the time of the retro-cession, was when she was accomplishing that retro-cession, in conformity with the previous act of Congress, by extending her laws and jurisdiction over the retroceded territory. It was a modification of that extension of her jurisdiction, in order to render it more perfect and beneficial; to which the General Government could have had no possible objection, and which might have been regarded as tacitly assented to by Congress, in the absence of any further legislation by that party; but which was expressly concurred in and provided for by the subsequent act of Congress. And even if any blunder had occurred, of omission or commission, in the progress of the legislative treaty; what well founded objection could there have been to a return to the subject by the parties to the compact, at any time when the occasion should require it, for the purpose of supplying the defect or correcting the mis *75 take ? The high contracting parties had full constitutional power over the subject, without limitation as to time: and that power could not be exhausted, until the retrocession, with its incidents, was rendered 'complete and perfect.
As to the competency of the authority. There could hardly be a cavil as to the competency of Congress to permit, or even prescribe, especially with the consent and for the benefit of Virginia, the exercise by the appellate Court of the district of that jurisdiction over causes pending therein, which that tribunal had lawfully acquired. And as to Virginia: when the judicial department of her government is called upon to pronounce that the legislative department has transcended its constitutional powers, the usurpation must be made manifest; and not the less so, when the question occurs in relation to a compact with another sovereignty, made under the authority of the federal constitution, and the effect of the adjudication is to be, if not an entire abrogation of the compact, a breach of good faith on the part of the State in regard to the other contracting party.
It is true that our State constitution declares the judicial power of Virginia shall be vested in certain tribunals of her own, whose jurisdiction is to be regulated by law. And if we could, suppose that the Legislature of Virginia would ever undertake to submit the administration of her laws, between her own citizens and on her own soil, to the authority and control of foreign tribunals, we would imagine an invasion, not only of the constitutional province of her judiciary, but an act of treason against the sovereignty of her people. But in this case there has been no delegation of jurisdiction to the judicial department of another government. No Court of Virginia has ever had jurisdiction of the appeals depending in the Supreme court of the United States, at the time of the retrocession of the territory *76 formerly ceded to the General Government. The jurisdiction over those appeals was reserved in the compact of retrocession to the tribunal which had inter"mediately acquired the same; and now to expunge ^ose remedies would be an act of judicial violence scarcely less flagrant than the extirpation of the rights which they involve.
The Court is therefore of opinion that there is no error in the decretal order of the Circuit Superior court; and it is ordered and decreed that the same be affirmed, with costs to the’appellee.